Ray E. SHAIN, Plaintiff,

v.

"John" ELLISON (Shield No. 761), et al., Defendants.

No. CV 96-3774.

United States District Court, E.D. New York.

June 1, 1999.

Herbst & Greenwald LLP, New York City, by Robert L. Herbst, for plaintiff.

Snitow & Cunningham, LLP, New York City, by Paul F. Millus, for defendant.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

This is a civil rights case brought by an individual who was arrested by Nassau County Police Officers and thereafter spent a night in the Nassau County Correctional Center ("NCCC"). Plaintiff states that he was the victim of the use of excessive force and that he was subject to an unconstitutional strip search.[1] The ex-

---

1. Plaintiff's complaint also contained allegations of false arrest, abuse of process and malicious prosecution. These claims have been previously dismissed by prior order of this court.

cessive force issue is presently pending before the court and is scheduled for trial. The court rules herein on plaintiff's motion for summary judgment regarding the constitutionality of Nassau County's strip search policy.

For the reasons set forth below, the court holds that plaintiff is entitled to summary judgment on the claim that the Nassau County strip search policy, which requires a strip/visual body cavity search of all prisoners remanded to custody of the NCCC, is unconstitutional. While the court is mindful and, indeed, sympathetic, to the legitimate security and safety needs expressed by the Nassau County Sheriff, the court is constrained by clear precedent holding that a blanket strip search policy, such as that practiced by Nassau County, violates the Constitution.

### BACKGROUND

#### I. *Plaintiff's Arrest*

Plaintiff was arrested by Nassau County police officers responding to a call placed by plaintiff's wife concerning a domestic dispute. While some facts are contested, it is clear that at the time of the call plaintiff and his wife were embroiled in divorce proceedings. Although plaintiff was living in the same house as his wife, an order of protection, which had expired the day before the police were called to the residence, required, *inter alia,* plaintiff and his wife to occupy separate portions of the home.

Among the police officers responding to the domestic dispute call was defendant police officer Ellison. Because it is unnecessary, for the purposes of this ruling, to discuss the specific facts surrounding Plaintiff's arrest, the court will state here only that plaintiff was arrested and subsequently remanded by a Nassau County

District Court Judge to the custody of the Nassau County Sheriff at the NCCC.

#### II. *Plaintiff's Search at the NCCC*

Upon arrival at the NCCC plaintiff was subject to that facility's procedures regarding all newly admitted prisoners. There are no questions of material fact regarding the policy for admission of new inmates to the NCCC. The Sheriff of Nassau County was deposed and testified that all individuals entering the NCCC are strip searched.[2] Additionally, the court has been provided with copies of the written procedure and has considered briefs, arguments of counsel and has heard testimony regarding the procedure. The procedure at issue is as follows.

All prisoners remanded to the NCCC are subject to a strip/visual body cavity search. The procedure makes no distinctions based upon the nature of the crime charged or the circumstances surrounding the particular arrest. It matters not whether a newly admitted prisoner has been remanded after a misdemeanor charge or a violent felony or drug charge. Indeed, while the NCCC is provided with papers indicating the crime with which the inmate has been charged, the officer performing the search has no information regarding the circumstances surrounding the inmate's remand to the NCCC. Nor are officers at the NCCC provided with information indicating whether there is a reasonable suspicion as to whether a particular inmate may be concealing contraband. The provision of such information is immaterial, however, since all inmates are subject to the search.

While plaintiff takes issue with the privacy with which the search is carried out, there is little question as to the actual procedures followed. All prisoners are told to disrobe completely. They are told

---

**2.** The court herein uses the term "strip search" interchangeably with "strip/visual body cavity search." Both terms refer to searches involving the removal of all clothes and a visual inspection of body cavities. Nei-

ther term refers to a search involving any touching of the person being stripped. The searches discussed in the Second Circuit cases referred to herein appear to have been the same type of search at issue here.

to run their fingers through their hair. A police officer inspects under the prisoner's arms, behind the prisoner's ears and in the prisoner's mouth. The prisoner is told to squat to facilitate a visual inspection of his buttocks. Male inmates are instructed to lift their genitals for a further visual inspection. At no time during this inspection are the prisoners touched—the body cavity search is strictly visual.

The police officer performing the search of plaintiff testified that the search took approximately one minute. Affidavit testimony attached to defendants' papers indicate that the search takes approximately two minutes. Plaintiff states that the search took approximately fifteen minutes. The court is confident that the actual inspection time lies somewhere in between these three estimates—any factual dispute concerning this issue, however is not material to the present motion.

## DISCUSSION

### I. Summary Judgment Standards

A motion for summary judgment may not be granted unless the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). Because there is no factual dispute as to the strip search procedure, this case is properly resolved in the context of a motion for summary judgment.[3]

### II. The Constitutionality of Strip Searches

 Thirteen years before this opinion and eleven years before plaintiff was arrested, the Second Circuit held clearly and unequivocally that the Fourth Amendment precludes prison officials from performing strip searches of arrestees charged with misdemeanor or minor offenses absent a reasonable suspicion that the person being searched is concealing weapons or other contraband. The suspicion can be based upon the crime charged or the circumstances surrounding the particular arrest. *See Weber v. Dell*, 804 F.2d 796, 802 (2d Cir.1986), *cert. denied*, 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). Any policy authorizing blanket strip searching of arrestees. without the required reasonable suspicion, is unconstitutional. *Id.* at 802.

Not only did the Second Circuit hold such blanket search policies unconstitutional in 1986, but the court further held that the constitutional right to be free from such searches was so clearly established, even in 1986, so as to preclude the Sheriff who established the county jail policy from invoking the defense of qualified immunity, *Weber*, 804 F.2d at 803.

The unconstitutionality of a blanket strip search policy was again made clear in 1988 when the Second Circuit decided *Walsh v. Franco*, 849 F.2d 66 (2d Cir.1988). In *Walsh*, the Second Circuit affirmed the district court's denial of a qualified immunity defense in a case involving the policy of the Chittendon County jail in Vermont. *Walsh* reiterated the holding of *Weber* and held, again, that the Fourth Amendment prohibits a blanket policy calling for strip searches of all misdemeanor or minor offense arrestees admitted to jail.

Relying on the fact that the unconstitutionality of a blanket strip search policy was sufficiently established in *Weber* so as to preclude a qualified immunity defense,

---

**3.** Defendant's brief argued that there was reasonable suspicion to carry out a strip search of plaintiff based upon the nature of the crime charged and the fact that plaintiff was found carrying a small knife. Defendant's conceded, however, that when plaintiff was strip searched at the NCCC, the officers at that facility had no information whatever regarding the nature of plaintiff's arrest or the crime with which he was charged.

the Second Circuit in *Walsh* had no trouble holding again in 1988 that defendants were not entitled to claim qualified immunity. *Walsh,* 849 F.2d at 69–70.

### III. *The Nassau County Policy*

■ It is against this backdrop of clear appellate authority that this court has been asked to consider the constitutionality of the Nassau County policy of strip searching all individuals remanded to the custody of the Nassau County Correctional Center. While the Nassau County defendants have come forward with much evidence they wish this court to consider with regard to security concerns allegedly particular to the Nassau County facility, they do not deny that the strip searching policy is applied without regard to the circumstances surrounding particular arrests or the crime with which the arrestee has been charged.

In *Weber* and *Walsh,* the Second Circuit made clear that strip searches may be justified only by focusing on the particular arrest—whether it be the nature the crime charged or the circumstances surrounding the arrest—and not on factors relating to the correctional facility. The Second Circuit has specifically rejected the argument that the mixing of arrestees along with the general jail population justifies a blanket strip search policy. Unwilling to consider generalized security concerns as justification for a blanket policy, the Second Circuit held that "the risk of a misdemeanor arrestee's introducing contraband into the general jail population simply did not warrant a strip search of all arrestees...." *Walsh,* 849 F.2d at 69. In light of this precedent, this court is precluded from considering the institutional concerns of the NCCC. This precedent further requires that this court find that the Nassau County strip search policy, which exists without the requirement of any suspicion, is unconstitutional.

### IV. *County Liability*

■ Nassau County may be liable for civil rights violations if the unconstitutional act resulting in plaintiff's injuries is, "[t]he execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy...." *Monell v. Dep't of Social Serv.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Weber,* 804 F.2d at 803, *Scott v. County of Nassau,* 1998 WL 874840 (E.D.N.Y.1998).

Here, as in *Weber,* there is no question but that the act of the Nassau County Sheriff, in establishing and maintaining policies regarding the searching of individuals at the NCCC, amounts to the official policy of Nassau County. Accordingly, the county may be liable for injuries resulting from the execution of this policy.

### V. *Qualified Immunity*

■ Defendants seek to invoke the defense of qualified immunity on behalf of the Nassau County Sheriff. As noted above, the Second Circuit held, as early as 1986, that the defense of qualified immunity was not available in cases involving blanket strip search policies. *See Weber,* 804 F.2d at 803. The unconstitutionality of a policy such as that in effect at the NCCC was clearly established at the time of plaintiff's arrest. Officials such as the Sheriff, are held to have "constructive knowledge of established law." *Walsh,* 849 F.2d at 69 (quoting *Salahuddin v. Coughlin,* 781 F.2d 24, 27 (2d Cir.1986)). Under the circumstances present here, it cannot be established that it was objectively reasonable to believe that a strip search of plaintiff was warranted. Accordingly, the Nassau County Sheriff is not entitled to the defense of qualified immunity.

### VI. *Institutional Concerns At The NCCC*

The court would be remiss if summary judgment were granted and the challenged practice condemned, without setting forth certain facts concerning the NCCC which gave this court great pause in striking down that facility's procedures. Had this

court the latitude to consider these concerns, the outcome of this motion may well have been different.

Approximately 1,100 individuals are employed at the NCCC, 950 of whom are corrections officers. The facility houses approximately 1,800 inmates on any given day. These inmates arrive at the NCCC, in their street clothes, from a variety of places throughout Nassau County. Each year, approximately 14,000 inmates are processed for introduction to the NCCC. Upon arrival at the NCCC, the corrections officer has available the history of the inmate's offenses (if any) as well as a notation explaining the reason the inmate is being held and commitment papers noting the remand from a judge.

Inmates at the NCCC are either awaiting trial or have been sentenced. They include those charged and/or convicted of crimes ranging from murder and rape to non-violent offenders. According to defendants, the NCCC also houses members of identifiable gangs.

The court has reviewed defendants' submissions regarding security concerns and notes the difficulty in maintaining a safe facility. According to defendant's submissions (which the court recognizes have not been subject to cross-examination), a random search of inmate files revealed that in the past two years there have been six occasions when an inmate was found to have various weapons during a strip search and eight occasions when the initial strip search revealed concealed drugs. While these numbers are not very high, when compared to the number of inmates coming through the facility, the dangers posed by concealed weapons in a facility such as the NCCC are indeed great.

Corrections officers at the NCCC are concerned not only with protecting themselves and other employees, but with protecting the safety of other inmates. Indeed, a failure to properly protect inmates may well result in the imposition of civil liability.

While the court is clear that the precedent established by *Weber,* and reiterated in *Walsh,* precludes this court from upholding a blanket strip search policy in the absence of reasonable suspicion regarding the arrest, the court notes that the prison facilities at issue in both *Weber* and *Walsh* were undoubtably different, in many important respects, from the facility at issue here. While the court does not profess to have an intimate knowledge of the inner workings of the Monroe County, Rochester jail (at issue in *Weber*) or the Chittenden County, Vermont jail (at issue in *Walsh*), or even of the size of those facilities, the court questions whether the institutional concerns present at the NCCC can be fairly compared to these facilities.

In sum, a full consideration of the facts surrounding the NCCC and its particular concerns may have resulted in a finding that a one or two minute strip search conducted in privacy might well be warranted when balanced against the concerns of this particular institution. The court makes no finding as to the proper outcome of this balance. Certainly, it would have been necessary to take additional testimony and have each party present their side of the story. Given the state of the law, however, the court could not properly consider this evidence.

## CONCLUSION

The policy of strip searching all misdemeanor and minor offense arrestees remanded to the NCCC, without requiring any suspicion that the remanded individual is concealing weapons or other contraband, violates the Fourth Amendment to the United States Constitution. Plaintiff's motion for summary judgment with regard to the strip searching policy in effect at the Nassau County Correctional Center is granted.

SO ORDERED.