**James BENJAMIN, et. al.,**
**Plaintiffs–Appellees,**

v.

**William J. FRASER, Commissioner of the Department of Correction of the City of New York, et. al., Defendants–Appellants.**

**Docket Nos. 00–9093 (LEAD),**
**00–9095(CON).**

United States Court of Appeals,
Second Circuit.

Argued March 12, 2001.

Decided Sept. 5, 2001.

178

Florence A. Hutner (Leonard Koerner, Elizabeth I. Freedman, June R. Buch, on the brief), for Michael D. Hess, Corporation Counsel of the City of New York, New York, NY, for Appellants.

John Boston (Daniel L. Greenberg, Madeline H. deLone, Lisa Freeman, Dale A. Wilker, on the brief), The Legal Aid Society, New York, NY, for Appellees.

Before CARDAMONE, LEVAL and KATZMANN, Circuit Judges.

LEVAL, Circuit Judge:

The New York City Department of Correction[1] appeals from an order of the

United States District Court for the Southern District of New York, Baer *J.*, denying in part the Department's motion to terminate consent decrees pursuant to the Prison Litigation Reform Act ("PLRA"), Pub L. No. 104–134, 101 Stat. 1321–66 §§ 801–810 (1996), *codified at* 18 U.S.C. § 3626. The consent decrees concern jail conditions for pretrial detainees in Department facilities.[2] The PLRA requires the termination of such consent decrees, upon a motion for termination under 18 U.S.C. § 3626(b), unless findings are made that prospective relief remains necessary to correct ongoing violations of a federal right and that the relief is narrowly drawn and the least intrusive means to correct the violation. *See* 18 U.S.C. § 3626(b)(3). In July 1996, the district court upheld the constitutionality of the PLRA and vacated the consent decrees. *See Benjamin v. Jacobson,* 935 F.Supp. 332 (S.D.N.Y.1996) (*"Benjamin I"*). A panel of the Court of Appeals affirmed in part and reversed in part. *See Benjamin v. Jacobson,* 124 F.3d 162 (2d Cir.1997) (*"Benjamin II"*). On rehearing in banc, the Court held that the plaintiffs were entitled to an opportunity to present evidence demonstrating the existence of current and ongoing violations of constitutional rights and the need for continuation of prospective relief. *See Benjamin v. Jacobson,* 172 F.3d 144 (2d Cir. 1999) (*"Benjamin III"*).

On remand, the district court held five days of hearings devoted to conditions affecting attorney visitation, use of restraints, restrictive housing, inmate cor-

1. The Department of Correction, the City of New York, and various officials are named as defendants. They are referred to herein collectively as "defendant" or the "Department."

2. The consent decrees in question were entered in this action and six related cases. *See Forts v. Malcolm,* 76 Civ. 101 (New York City Correctional Institute for Women), *Ambrose v. Malcolm,* 76 Civ. 190 (Bronx House of Deten-

tion for Men), *Maldonado v. Ciuros,* 76 Civ. 2854 (Adolescent Reception and Detention Center), *Detainees of the Brooklyn House of Detention for Men v. Malcolm,* 79 Civ. 4913, *Detainees of the Queens House of Detention for Men v. Malcolm,* 79 Civ. 4914, *Rosenthal v. Malcolm,* 74 Civ. 4854 (Adult Mental Health Center on Rikers Island).

respondence, and law libraries.[3] In a detailed opinion, Judge Baer granted most of the relief sought by the Department's motion, terminating the consent decrees that called for judicial supervision over restrictive housing, inmate correspondence, and law libraries. The court denied the Department's motion to terminate decrees relating to attorney visitation and due process affecting the use of restraints, see *Benjamin v. Kerik,* 102 F.Supp.2d 157 (S.D.N.Y. 2000) ("*Benjamin IV*"), and specified the terms of the continuing relief, see *Benjamin v. Kerik,* No. 75 Civ. 3073(HB), slip op. at 1–2 (S.D.N.Y. August 3, 2000); *Benjamin v. Kerik,* No. 75 Civ. 3073(HB), slip op. at 2–3 (S.D.N.Y. August 10, 2000). Defendants appealed.[4]

## BACKGROUND

### A. Attorney Visitation

Based on the evidence introduced at the hearings, the district court found that defense attorneys[5] routinely face unpredictable, substantial delays in meeting with clients detained at Department facilities. The court determined that attorneys are forced to wait between 45 minutes and two hours, or even substantially longer, after arriving at a facility to see a client.[6] See *Benjamin IV,* 102 F.Supp.2d at 171.

The record indicates that several factors contribute to these delays. First, many Department facilities have few counsel rooms relative to the number of detainees housed at the facility.[7] Second, certain detainees may not be moved to counsel rooms without escort officers. Third, inmates are generally not brought to counsel rooms during inmate counts, which can delay visits for several hours. Since the counts are held at unpredictable times and the Department does not furnish schedules for attorneys, attorneys cannot time their visits so as to avoid the counts. The Department's Bureau Chief for Management and Planning conceded that security considerations did not require the freeze of inmate movement during counts, and that, while detainees are not brought to attor-

---

3. Additional hearings on other issues were held later and were not included in this appeal.

4. As the plaintiffs did not cross-appeal on the restrictive housing, inmate correspondence, and law library issues, only the issues of attorney visitation and restraint status are before us.

5. We use the term "attorney" to include social workers, paralegals and other personnel working under an attorney's supervision in preparing the defense of the accused.

6. To visit a detainee on Rikers Island, which is accessible only from Queens, an attorney must first travel there by bus or car. Arriving by car, the attorney must park, obtain a pass, drive across a bridge, park again, and then enter the Rikers Island Control Building. A public bus also stops at the Control Building. Once inside the Control Building, the attorney must wait to obtain a pass, and then wait

again—often for 20 minutes—for a bus to a particular jail on the island. At the jail, the attorney tells the gate officer whom he wishes to visit. The officer determines where the detainee is housed and telephones the housing area. The detainee is then either directed to proceed to the intake area, or, if necessary, escorted there by an officer. The detainee dons a jumpsuit, submits to a search (if required), and enters the counsel room. The attorney passes through a magnetometer, exchanges his initial pass for a jail pass, and then proceeds to the visiting area. At the borough jails, the same procedure is followed as from the time of arrival on Rikers Island.

7. The ratio of counsel rooms to detainees varies dramatically between different Department facilities. The North Infirmary Command, with 476 detainees, has only one counsel room. The ratio of rooms to detainees is 1:176 at the Manhattan Detention Center, but 1:683 at the Adolescent Reception and Detention Center.

ney visits during counts, they are taken to family visits. The defendants were unable to identify security or administrative problems that would result from such movement to meet with attorneys during counts.

The district court found that "attorney-client visitation has been significantly compromised" by the delays. *Benjamin IV*, at 178. Several Legal Aid Society ("LAS") attorneys testified that they had largely stopped visiting clients at particular facilities, that they were sometimes forced to abandon efforts to meet with clients after arriving at Department facilities, and that the delays deterred necessary consultation, particularly given that LAS attorneys typically handle 60–100 cases at a time. For example, LAS attorney Heidi Segal testified that

> [b]ecause you know you're experiencing significant delays ... you make determinations about whether or not you even have the time to visit a client, so there are times that you would forego a visit if you only had four hours free that day as opposed to six or seven. On days ... where I experienced significant delays, I would cut short my visit....

Similarly, Jesse Uhrman, the social work supervisor for LAS's Parole Revocation Defense Unit, stopped visiting clients at one of the facilities because of extensive delays. LAS witnesses, testified that the delays impaired their ability to establish rapport and trust with clients, to collect information from clients, to counsel clients in a crisis, and to assist clients in considering plea agreements.

Plaintiffs also established that courthouse visits are not an adequate substitute for jailhouse visits. *See Benjamin IV*, at 178. Courthouse visits are not available on less than a day's notice, nor in the evenings or on weekends. Attorneys must call every hour to see if their client has been produced. Inmates may be returned to jail before the attorney arrives, or may not be produced at all. Some of the counsel rooms at the courthouses are not private. Finally, when attorneys rely on courthouse visits, the burden on the client may cause the attorney-client relationship to suffer. Inmates are awakened at 4:00 a.m. for transport to court and may wait eight hours in a bullpen to see their attorney. Depending on their restraint status, inmates may spend the entire day in restraints in order to meet with their attorney for a few minutes.

Judge Baer considered the viability of plaintiffs' suggestions for reducing delays and the extent to which the suggested measures would impose an intrusive burden on the Department's institutions. The suggested measures included providing counsel with a reliable pamphlet detailing visiting hours for different facilities, assigning more officers to escort duty, or initiating the process of bringing detainees to the counsel room at the point the attorney checks into the facility, rather than when the attorney reaches the visiting area. Noting that the plaintiffs had " 'point[ed] to ... alternative[s] that fully accommodate[ ] the prisoner's rights at a de minimis cost to valid penological interests,' " *Benjamin IV*, at 177 (quoting *Turner v. Safley*, 482 U.S. 78, 91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)), the court concluded that "current obstacles to attorney visitation are not justified by legitimate penal interests.... [T]he Department's facilities are frequently inadequate for counsel visits and defendants' institutional security regulations are not the sole or even the primary reason for undue delays to attorney visits." *Id.* at 178.

Having concluded that the defendant's policies "led to unconstitutional burdens to inmate access to counsel and courts," Judge Baer ordered the defendants to pro-

vide recommendations for prospective relief. *Id.* at 178. After reviewing these recommendations, the court issued an order which required that the Department establish procedures to ensure that attorney visits commence within 45 minutes of an attorney's arrival at Rikers Island, or within 30 minutes of an attorney's arrival at a borough facility. In addition, the order required the defendants to ensure both that an adequate number of attorney visiting rooms be made available and that such rooms foster the requisite degree of privacy. *See Benjamin,* No. 75 Civ. 3073(HB), slip op. at 1–2 (August 3, 2000). The court specifically found that this relief was "necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and … [was] narrowly drawn and the least intrusive means to correct the violation." *Id.* at 1.

### B. Red I.D. Status and Restraint Status

Detainees not classified for special restraints may move within the Department's jails free of mechanical restraints. When taken outside of the facilities—for example to court—they wear handcuffs secured in front of their bodies. Inmates classified as either "Red I.D." or "restraint status" are subjected to heightened restraints described below, which are painful and at times injurious.

The Red I.D. policy is designed to prevent violence when inmates are moved outside of Department jails. Restraint status is designed to reduce violence within Department facilities. Out of roughly 15,000 detainees, there are approximately 225 in Red I.D. status and 60 in restraint status.

Inmates who have been found to possess a weapon while in the Department's custody are assigned Red I.D. status. A Red I.D. detainee must wear a red identification card which enables Department staff to determine that the detainee is subject to special attention during jail searches and strip frisks. When Red I .D. detainees are moved anywhere outside their facility, their hands are placed in black tubes termed "security mitts." Although the exact types of restraints apparently vary, typically the cuffs are attached to a waist chain and the hands are cuffed behind the back facing outwards. The detainee may also be placed in leg irons. During the detainee's courthouse visit, he may be shackled in this manner for up to fourteen hours.

Restraint status, which is more restrictive than Red I.D., is for individuals who have committed a violent act while in custody. Restraint status detainees are subject to the same restraints as Red I.D. inmates not only when they are moved outside the jail, but also when they are moved within the jail, for example, to the clinic, recreation area, or law library. The Department's regulations specify that restraint status "shall not be considered a punishment, but shall·be a method of protecting staff and inmates from being attacked. It is also a means of deterring inmates from engaging in assaultive behavior." *See* City of New York Department of Correction Operations Order No. 14/97.

At the hearings before the district court, detainees testified that the shackling which accompanies Red I.D. and restraint status is painful. The inmates stated that they often required medical attention and painkillers after spending a day in restraints. Nicolaj Amann, a Red I.D. inmate, testified, for example, that whenever he went to court he was chained, placed in leg shackles, and handcuffed behind his back with "the black box"—a rigid metal cover that prevents the handcuffs from being

moved between the wrists. After court visits, he needed to seek medical treatment "because my shoulder was completely numb from being handcuffed like that all day." Louis Roque, who was similarly restrained, testified of his injuries:

> They're very painful. The black box—[to the Court] I don't know if you could see my hands. The handcuffs usually go on the wrists, and you have some movement, but when they put a black box on it and they force you to bring it in, it forces your hand, your arms out on the sides and the metal rubs on the wrists.
> The Court: So those, the welts that are on there, they come from the restraints?
> The Witness: Yes, sir.
> The Court: Can I see the other wrist? I see. Okay. Thank you.
> The Witness: See the black box, it's—it holds the handcuff rigid. It doesn't give it any movement one way or the other. It goes in between and then they make you put a chain, the[y] want to put a chain around your stomach and when they—when you hold it in, your arms are forced out, so it rubs, it bites into the bone.

Another inmate, Andre Greene, testified that after being in the court pens for fourteen hours with his arms held behind his back, he needed "muscle relaxers and pain killers because of the pain." He added that the restraints make detainees vulnerable to attacks by other prisoners and that officers assigned to protect them "don't pay attention." He reported that "one of the inmates in my building he was cut from his ear to his neck, and he wasn't even able to defend himself, while an officer stood right there talking to another female officer."

In addition to inmate witnesses, plaintiffs called LAS attorney Russell Neufeld, who testified that he had seen the "severe injury to the wrists and cuts and bleeding"

that occurs after detainees are transported in restraints.

The issue before the district court was not the use of restraints, which are necessitated in appropriate cases by security concerns, but rather whether the process of designating a detainee for restraints entails any procedural protections to insure that painful, onerous, even injurious restraints be terminated if instituted without reason. Where the accusations that led to the imposition of Red I.D. status occasioned a disciplinary charge, Department policies do not provide for removal from Red I.D. status if the disciplinary charge is dismissed, the detainee is exonerated, or no hearing is held.

Red I.D. and restraint status may be imposed by the warden or deputy warden without prior notice or an opportunity to be heard. According to the rules, inmates may appeal placement in Red I.D. status by writing to the warden, who is to investigate the circumstances surrounding the appeal. If the appeal is denied, Department policy requires that the detainee receive a written response explaining the reasons for the denial. *See* City of New York Department of Correction Operations Order No. 15/94. As to restraint status, a month after the determination, and every four weeks thereafter, Department policy provides for a "review" to determine if "a change in [the inmate's] conduct justifies the removal of restraints." *See* City of New York Department of Correction Operations Order No. 14/97.

The evidence, however, showed that the Department's review policies are not followed in practice and that the directions of medical staff affecting prisoners in special restraint status are not necessarily followed. For example, detainee Nikolaj Amann was placed in Red I.D. status after arguing with a staff member and later

being told that a razor was found in his property. He was never charged with any rule violation or given a hearing. When he tried to challenge his status, jail staff would not give him a decision in writing. His subsequent efforts to contest his Red I.D. designation in state court failed because he could not document that he had exhausted administrative remedies. Detainee Keith Todd was likewise accused of possessing a razor. A disciplinary charge was brought, but dismissed with no finding of guilt. Criminal charges brought by the Department were dismissed by the grand jury. Todd sent two letters to the warden to appeal his status but received no response. Inmate Andre Greene testified that after he attempted to commit suicide by slashing his wrists, medical staff directed that he not be handcuffed until his wrists had healed.[8] However, Greene was simply given band-aids and then cuffed over the wounds. Keith Todd, a Red I.D. inmate, testified that he suffered extreme pain because of restraints, that he developed numbness in both hands, and that he was diagnosed with damaged nerves. A jail doctor's orders not to handcuff him behind his back did not stop the practice.

The Office of Compliance Consultants ("OCC"), which was asked by the court to investigate the defendant's procedures, found that inmates "placed in non-routine restraint status were not afforded the due process rights prescribed by the consent decree." According to OCC:

> While many [Department] security folders contained monthly reviews of non-routine security status, only a few folders contained documentation indicating that security restraint inmates were afforded the opportunity to appear before a Hearing Officer ... as required by the consent decree and Departmental policy. In those few cases in which restraint

status was reviewed by the Adjudication Unit, the security folder did not contain documentation of what took place at the hearing. . . .

The district court concluded that Red I.D. and restraint status involve punishment as well as administrative justification, and that the Department, by imposing such sanctions without providing meaningful subsequent review, violates the constitutional standard of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *See Benjamin IV*, at 178. After receiving proposed orders from counsel, Judge Baer issued an order requiring that (a) within 72 hours after placing an inmate in Red I.D. or restraint status, the Department afford the inmate a hearing pursuant to *Wolff*; (b) within 72 hours of the hearing, a written decision be prepared by the hearing officer and given to the inmate; (c) appeals from placement in Red I.D. or restraint status be reviewed within seven days; (d) inmates be given the opportunity to seek further review based upon good cause; and (e) inmates subjected to Red I.D. or restraint status receive monthly medical reviews. *See Benjamin*, No. 75 Civ. 3073(HB), slip op. at 2–3 (August 10, 2000). The court found that this relief met the prerequisites of the PLRA, being narrowly drawn, minimally intrusive, and extending no further than necessary to correct an ongoing violation of a constitutional right. *See id.* at 1.

### DISCUSSION

■ The PLRA provides that:

Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right,

---

8. The district court saw Greene's wounds.

extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. § 3626(b)(3). When a defendant moves to terminate a consent decree, plaintiffs must be "given an opportunity to present evidence showing the need for continuation of prospective relief." *Benjamin III,* 172 F.3d at 166.

■ The district court, after conducting hearings, determined that prospective relief remained necessary in two of the five areas litigated. On appeal, defendant contends that the district court both misapplied the law and misconstrued the evidence. Reviewing the questions of law *de novo,* the questions of fact for clear error, and the matters of discretion for abuse of discretion, *see Pierce v. Underwood,* 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), we affirm.

### A. Attorney Visits—The Applicability of Lewis v. Casey to Pretrial Detainees' Access to Counsel

■ As regards attorney visits, defendants contend that the district court erred by rejecting their argument that *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), applies to claims brought under the Sixth Amendment, and by instead applying the standard set out in *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled in part on other grounds by Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). Both *Procunier* and *Lewis* involve the claims of convicted prisoners; unlike this case, they involve neither Sixth Amendment claims of right to counsel nor pretrial detainees. We agree with the district court that *Procunier,* which concerned restrictions on attorney contact with clients, more closely

parallels our case than *Lewis,* which concerned the provision of law libraries and legal assistance. We hold that *Lewis* is inapplicable.

The *Procunier* plaintiffs challenged regulations which prevented the use by attorneys of law students or paralegals to undertake such tasks as interviewing inmates and obtaining prisoner signatures. The Supreme Court held that "inmates must have a reasonable opportunity to seek and receive the assistance of attorneys" and that "[r]egulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier,* 416 U.S. at 419, 94 S.Ct. 1800. In finding an unjustifiable burden on the prisoners' right of access to the courts, the Court weighed the financial and time costs imposed on attorneys by travel to remote prisons. *See id.* at 420, 94 S.Ct. 1800.

*Lewis* was a class action in which the district court, relying on *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (requiring adequate law libraries or legal assistance), entered a sweeping injunction to improve law libraries and legal assistance programs in Arizona prisons. In striking down the injunction, the Supreme Court held that a prisoner alleging a *Bounds* violation must show "actual injury." *Lewis,* 518 U.S. at 349, 116 S.Ct. 2174. Thus, to establish a claim of inadequate access to the courts under *Bounds,* an inmate must show "that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim"—for example, by demonstrating that he has been unable to file a complaint or has had a complaint dismissed for failure to observe a technicality. *Id.* at 351, 116 S.Ct. 2174.

The Department contends that *Lewis*'s standing requirement of "actual injury"

applies not just to law libraries and legal services, but to all access-to-the-courts and right-to-counsel claims. It argues, "Interference with attorney visits does not rise to the level of a constitutional violation unless the inmate is completely denied access to courts or legal counsel, or a policy exists that creates a substantial interference with attorney-client communication that has an identifiable detrimental effect."

We disagree. The Court in *Lewis* gave no indication that it intended to overrule *Procunier*. *Procunier* (relating to an inmate's ability to seek and receive the assistance of an attorney) is closer than *Lewis* (dealing with the state's obligation to provide legal services and a law library to convicted prisoners) to our case. More importantly, *Lewis* is inapplicable to Sixth Amendment claims of pretrial detainees.

■■■ *Lewis*'s reasoning is premised on the distinction between the standing required to assert direct constitutional rights versus the standing required to assert claims that are derivative of those rights. Because law libraries and legal assistance programs do not represent constitutional rights in and of themselves, but only the means to ensure "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts," prisoners must demonstrate "actual injury" in order to have standing. *Lewis*, 518 U.S. at 351, 116 S.Ct. 2174 (internal quotations omitted). In the absence of actual or imminent harm, "the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches," *id.* a 349, requires the judicial branch to leave to the political branches the choice among "alternative means to achieve .... meaningful access to the courts," *id.* at 351, 116 S.Ct. 2174. By contrast, where the right at issue is provided directly by the Constitution or feder-al law, a prisoner has standing to assert that right even if the denial of that right has not produced an "actual injury."

■■■ The right of the accused "[i]n all criminal prosecutions ... to have the Assistance of Counsel for his defence" is a direct right, grounded squarely in the text of the Constitution. U.S. Const. amend. VI. While a prisoner complaining of poor law libraries does not have standing unless he can demonstrate that a direct right— namely his right of access to the courts— has been impaired, in the context of the right to counsel, unreasonable interference with the accused person's ability to consult counsel is itself an impairment of the right. As the Supreme Court has recognized, "to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." *Maine v. Moulton*, 474 U.S. 159, 170, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). *See also Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir.1978) ("[O]ne of the most serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense."), *rev'd on other grounds, Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Johnson–El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir.1989) (when pretrial detainees' interest in effective communication with attorneys is "inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised"). While certain restrictions on a detainee's right to counsel may be justified by the constraints of institutional management, this does not affect the detainee's standing to challenge those restrictions. In other words, the standing question raised by *Lewis*—whether a person's interests have been harmed in a way that creates a justiciable controversy—must be distinguished from the subsequent question of justification—whether such an im-

pairment is necessitated by a legitimate government interest.

The Department is correct that the right to counsel and the right of access to the courts are interrelated, since the provision of counsel can be a means of accessing the courts. However, the two rights are not the same. The access claims at issue in *Lewis* concerned the ability of convicted prisoners "to attack their sentences, directly or collaterally, and ... to challenge the conditions of their confinement." 518 U.S. at 355, 116 S.Ct. 2174. By contrast, here we are concerned with the Sixth Amendment right of a pretrial detainee, in a case brought against him by the state, to utilize counsel in his defense. It is not clear to us what "actual injury" would even mean as applied to a pretrial detainee's right to counsel. *Lewis* describes "actual injury" as a showing that a "non-frivolous legal claim had been frustrated or was being impeded" due to the action of prison officials. *Lewis*, 518 U.S. at 353, 116 S.Ct. 2174. The reason pretrial detainees need access to the courts and counsel is not to present claims to the courts, but to defend against the charges brought against them. *See Murray v. Giarratano*, 492 U.S. 1, 7, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989) (contrasting "trial stage of a criminal proceeding, where the State by presenting witnesses and arguing to a jury attempts to strip from the defendant the presumption of innocence and convict him of a crime," with the post-conviction stage "where the defendant needs an attorney not as a

shield to protect him against being haled into court by the State and stripped of his presumption of innocence, but rather as a sword to upset the prior determination of guilt" (internal quotation marks omitted)).

■ In considering burdens on the Sixth Amendment right to counsel, we have not previously required that an incarcerated plaintiff demonstrate "actual injury" in order to have standing.[9] *See Perry v. Leeke*, 488 U.S. 272, 278–80, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989) (stating that denial of access to counsel for consultation "is not subject to [ ] prejudice analysis"); *Wolfish*, 573 F.2d at 133 (remedial order affirmed where "attorney visits were made in the general visiting rooms during visiting hours thereby entailing long delays, limiting the attorney's time with his client, and totally vitiating confidentiality"); *Covino v. Vermont Dep't of Corr.*, 933 F.2d 128, 130 (2d Cir.1991) (remand to determine whether detainee's transfer to a more distant jail impaired his Sixth Amendment right to counsel); *cf. Smith v. Coughlin*, 748 F.2d 783, 789 (2d Cir.1984) (ban on visits by paralegal personnel to convicted inmate violated the Sixth Amendment; although inmate could not prove compensable injury, he was entitled to nominal damages); *see also Schoemehl*, 878 F.2d at 1052 (restrictions on telephone access to attorneys by pretrial detainees were "inadequately justified"); *Cobb*, 643 F.2d at 959–60 (upholding injunctive relief against pretrial transfer of detainees to distant

---

9. The Department's argument confuses "actual injury" with "harmless error." Where a defendant's Sixth Amendment were violated and the relief sought is a new trial, "harmless error" analysis applies. *See, e.g., Lainfiesta v. Artuz*, 253 F.3d 151, 158 (2d Cir.2001) (finding refusal to permit co-counsel of choice to cross examine witness to be harmless error). By contrast, in an action such as this one, the remedy sought is the removal of unjustifiable interference with attorney-client communica-

tion. *Compare Cobb v. Aytch*, 643 F.2d 946, 960 (3d Cir.1981) (affirming district court's finding that no remedy at law could compensate for interference with detainees' right to counsel and therefore granting injunctive relief limiting city's authority to transfer detainees to far-away facilities), *with United States v. Lyons*, 898 F.2d 210, 216 n. 6 (1st Cir.1990) (denying new trial because prisoner was not prejudiced by pretrial transfer to different facility).

facilities since such transfers caused "substantial interference with the right to effective assistance of counsel").

 Having determined that *Lewis* is inapplicable and that both the due process right of access to the courts and the Sixth Amendment right to counsel are implicated, we apply the standards set out in *Procunier,* 416 U.S. at 419, 94 S.Ct. 1800 ("unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts"), and *Bell,* 441 U.S. at 547, 99 S.Ct. 1861 (when an institutional restriction on pretrial detainees infringes a specific constitutional guarantee [i.e., the Sixth Amendment], "the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security").[10] We note that this circuit has adopted similar standards in *Wolfish,* 573 F.2d at 133, finding prison regulations restricting pretrial detainees' contact with their attorneys to be unconstitutional where they "unreasonably burdened the inmate's opportunity to consult with his attorney and to prepare his defense." Similarly, in *Cobb,* 643 F.2d at 957 we enjoined prison transfers that "significantly interfered" with pretrial detainees' ac-

cess to counsel. *See also Covino,* 933 F.2d at 130 (citing *Cobb*). The district court found that the "defendants' institutional security regulations are not the sole or even the primary reason for undue delays to attorney visits." *Benjamin IV,* at 177. This finding was amply supported by the record. The Department did not offer any justification for allowing family visits but not attorney visits during counts. No reasons were given why the Department could not begin the process of bringing detainees to counsel rooms when an attorney first checks in to the facility, rather than when the attorney arrives at the visiting area. Nor did the defendant present evidence explaining why a reservation policy could not be used in facilities with limited visiting space.

We so no reason to overturn Judge Baer's conclusion that the reasonable measures ordered would safeguard the detainees' constitutional rights at minimal cost to the Department and without impairing its institutional concerns. *Cf. Turner,* 482 U.S. at 91, 107 S.Ct. 2254 ("[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid [governmental]

---

10. The district court applied the test set out in *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987): "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." We doubt that this standard properly applies to this case. *Turner* involved convicted prisoners rather than pretrial detainees, and the standard it promulgated depends on "penological interests." Penological interests are interests that relate to the treatment (including punishment, deterrence, rehabilitation, etc ... ) of persons convicted of crimes. Although some of the concerns of pretrial detention, especially protection against further criminal conduct, overlap with the concerns of penology, there are important differences. Penological interests are therefore arguably not an appropriate guide for the

pretrial detention of accused persons. *See Mauro v. Arpaio,* 188 F.3d 1054, 1059 n. 2, 1067 (9th Cir.1999) (en banc) (Kleinfeld, J., dissenting) (arguing that *Turner* is inappropriate standard for pretrial detainees since *Turner* speaks of "penological interests," and state does not have legitimate penological interests as against unconvicted persons; majority held this argument waived), *cert denied,* 529 U.S. 1018, 120 S.Ct. 1419, 146 L.Ed.2d 311 (2000). We need not decide this issue, however, as we believe the policies and practices at issue here would not survive scrutiny under *Turner,* if in fact that standard is applicable. *Turner* furthermore did not raise issues of attorney access to prisoners. While *Procunier* also dealt with convicted prisoners, it seems far more pertinent than *Turner,* as it dealt specifically with the issue of attorney access to prisoners.

interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."). We find no error in Judge Baer's conclusion that with respect to attorney visitation there was a continuing need for prospective relief to correct an ongoing denial of a federal right, and that the relief ordered was sufficiently narrow to satisfy the requirements of the PLRA.

### B. Red I.D. Status and Restraint Status

■■■■ The Department argues the district court erred in holding that Red I.D. and restraint status are extraordinary restraints on the liberty of pretrial detainees that call for a reasonably prompt hearing and periodic review. *See Benjamin IV,* at 176. It contends first that the detainees do not have a protected liberty interest that would trigger a right to procedural due process, and that, assuming *arguendo* they do, the procedural protections provided by the Department are adequate.

■■■■ "[L]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Youngberg v. Romeo,* 457 U.S. 307, 316, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (internal quotation marks omitted). The interest survives a criminal conviction and incarceration, pretrial detention, or involuntary civil commitment. *See id.* Of course, a detainee's liberty interest in freedom from restraint is highly qualified and must be balanced against the state's reasons for restraining that liberty. *See id.* at 320–21, 102 S.Ct. 2452. Under *Bell,* the Supreme Court's seminal pretrial detention case, restrictions on pretrial detainees that implicate a liberty interest protected

under the Due Process Clause may not "amount to punishment of the detainee." 441 U.S. at 534, 99 S.Ct. 1861. Absent a showing of an expressed intent to punish, the determination whether a condition is imposed for a legitimate purpose or for the purpose of punishment "generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Id.* at 538, 99 S.Ct. 1861 (internal quotation marks omitted).

The district court found that "[d]espite the formal characterization of restraint status and Red I.D. status as a non-punitive safety measure ... these sanctions ... have a severe and deleterious effect on pretrial detainees tantamount to punishment." *Benjamin IV,* at 170. The court noted that "restraint status and Red I.D. status can prove to be a painful restraint on liberty," and that restraint status can result in injury. *Id.* at 177. We see no basis to overturn the court's ruling, particularly given that the court did not restrict the Department's use of such restraints or impose preconditions, but merely required reasonable after-the-fact procedural protections to ensure that such restrictions on liberty will be terminated reasonably soon if they have no justification.

The appellants also argue that the restraints are permissible because they do not "impose[ ] atypical and significant hardship ... in relation to the ordinary incidents of prison life," as required by *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

The district court concluded, joining our fellow Circuits, that *Sandin* does not apply to pretrial detainees.[11] *See, e.g. Resnick v.*

---

11. Defendants claim that by discussing *Sandin*'s applicability in *Tellier v. Fields,* 2001 WL 457764, at *3 (2d Cir. April 26, 2001), *superseding,* 230 F.3d 502, 512 (2d Cir.2000),

*Hayes,* 213 F.3d 443, 448 (9th Cir.2000) (reading *Sandin* to mean that a pretrial detainee, unlike a convicted prisoner, has a liberty interest in not being placed in disciplinary segregation); *Rapier v. Harris,* 172 F.3d 999, 1004–05 (7th Cir.1999) (distinguishing *Sandin* because pretrial detainees "are not under a sentence of confinement, and therefore it cannot be said that they ought to expect whatever deprivation can be considered incident to serving such a sentence"); *Mitchell v. Dupnik,* 75 F.3d 517, 523 (9th Cir.1996) (because "the *Sandin* reference to 'ordinary incidents of prison life' refers to the ordinary incidents of imprisonment under a sentence after conviction," pretrial detainees may only be subjected to disciplinary segregation if they are provided a due process hearing to determine whether they have in fact violated any rule); *Whitford v. Boglino,* 63 F.3d 527, 531 n. 4 (7th Cir.1995) ("*Sandin* does not apply to pretrial detainees, who may not be punished without due process of law regardless of state regulations."); *cf. Fuentes v. Wagner,* 206 F.3d 335, 341–42 n. 9 (3d Cir.) (*Sandin,* which "concern[ed] punishment of a sentenced prisoner," was inapplicable to convicted but not yet sentenced detainee), *cert. denied,* 531 U.S. 821, 121 S.Ct. 63, 148 L.Ed.2d 29 (2000).

*Sandin* proclaimed a return to the principles of *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Meachum*—a case where convicted prisoners challenged transfer from a medium to a maximum security facility—was grounded on the idea that a conviction extinguishes liberty interests:

we determined that *Sandin* applies to pretrial detainees. In *Tellier,* which concerned a convicted state prisoner being held in a federal pretrial facility with a pending federal charge, we never discussed whether *Sandin* applies to pretrial detainees or pretrial detention facili-

*Given a valid conviction,* the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution. . . . The *conviction* has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in any of its prisons . . . . within the normal limits or range of custody which the *conviction* has authorized the State to impose.

*Id.* at 224–25, 96 S.Ct. 2532 (emphases added).

Moreover, *Sandin* itself specifically distinguished pretrial detainees from convicted prisoners. The Court rejected precedents from cases concerning pretrial detainees, noting that "[t]he punishment of incarcerated prisoners . . . serves different aims than those found invalid in *Bell [v. Wolfish.]*" *Sandin,* 515 U.S. at 485, 115 S.Ct. 2293. While convicted prisoners "do not shed all constitutional rights . . . . [d]iscipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the *sentence imposed* by a court of law." *Id.* (emphasis added).

■ The district court concluded that detainees placed in Red I.D. or restraint status should reasonably promptly thereafter be accorded due process hearings in accordance with the Supreme Court's decision in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The Department contends that if any process is due, the standard is not that of *Wolff v.*

ties. *See id.* Moreover, under federal law, the plaintiff was not even a pretrial inmate. *See* 28 C.F.R. § 551.101(3) ("[A]n inmate . . . who is at the same time serving a state or federal sentence is not considered a pretrial inmate.").

*McDonnell*, but that of *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), *qualified on other grounds by Sandin*, 515 U.S. at 482–84, 115 S.Ct. 2293.

■■■ The *Wolff* Court, while holding that full adversary proceedings are not required for disciplinary deprivations of liberty in the prison setting,[12] required written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence. *See id.* at 561–70, 94 S.Ct. 2963. By contrast, under *Hewitt*, a convicted inmate placed in administrative segregation pending a completion of a misconduct investigation "must merely receive some notice of the charges against him and an opportunity to present his views." *Hewitt*, 459 U.S. at 476, 103 S.Ct. 864. Thus, the procedures required by *Wolff* apply if the restraint on liberty is imposed for disciplinary reasons; if the restraint is for "administrative" purposes, the minimal procedures outlined in *Hewitt* are all that is required. *See Soto v. Walker*, 44 F.3d 169, 172 & n. 3 (2d Cir.1995); *Matiyn v. Henderson*, 841 F.2d 31, 34 (2d Cir.1988). *See also Bolden v. Alston*, 810 F.2d 353, 357 (2d Cir.1987) ("the level of procedural protection [required by Due Process] differs according to the purpose of the confinement.").

■■■■ "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (internal quotation marks omitted). In determining what due process requires, we must look at "the precise nature of the government function involved as well as the private interest that has been affected." *Wolff*, 418 U.S. at 560, 94 S.Ct. 2963. The private interest at stake in *Hewitt* was found to be "not one of great consequence." 459 U.S. at 473, 103 S.Ct. 864. A detainee's interest in freedom from unjustified infliction of pain and injury is more substantial. Of course the governmental interest in institutional security is also substantial. Indeed, as in *Gerstein v. Pugh*, 420 U.S. 103, 113–114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), which concerned probable cause hearings for suspects arrested without a warrant, the government's interest here initially outweighs that of the individual. But as in *Gerstein*, the initial governmental need is satisfied by the imposition of restraint. *See id.* There is no substantial government need for denying subsequent review of the justification for imposing painful and potentially harmful restraints.

Judge Baer's order fully recognized the importance of the state interest in being able to impose Red I.D. and restraint status immediately. *See Benjamin*, No. 75 Civ. 3073(HB), slip op. at 1–3 (August 10, 2000). The court required no prior hearing. It imposed no restrictions on the immediate imposition of heightened restraints. The court required only that subsequent process be granted. *See id.* at 2. Thus, the court's ruling in no way impairs the ability of facility officials who believe a detainee is dangerous to restrain him immediately. We find the district court was entirely reasonable in requiring subsequent procedures that conform to the requirements of *Wolff*.

## CONCLUSIONS

We find no error in the district court's written findings that prospective relief

---

12. As the appellees note, *Wolff*'s rationale for provided limited procedural protections was grounded in the fact that prisoners are people "who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so." *Wolff*, 418 U.S. at 561, 94 S.Ct. 2963. While that rationale is not applicable here, we see no reason to craft another standard in the absence of a request to do so.

remains necessary to correct ongoing violations of federal rights with respect to attorney visitation and the imposition of restraints, and that the relief ordered extends no further than necessary, and is the narrowly drawn, least intrusive means to correct the violation.[13] Judgment affirmed.

13. In one respect, which the Department has not addressed in its arguments, we doubt that the district court's remedial order conformed to the requirements of the PLRA. The court's order required that detainees classified for Red I.D. and restraint status receive monthly medical reviews. We are inclined, however, to doubt the need for period medical reviews where the prisoner has made no medical complaint. We would assume that, depending on their size, age, flexibility and other factors, different persons are differently affected by restraints. Furthermore, Red I.D. status calls for use of restraints only on excursions outside the jail. The detainee may have had no such visits during a month, and may therefore have had no imposition of the restraints. For other prisoners, the impositions of restraints may be brief, or may regardless have caused no pain or problem.

We would think the medical problems occasioned by heightened restraints could be handled by giving medical attention to detainees who requested it, or complained of a medical problem. The district court's order, apart from being of doubtful necessity, imposes on the facility the need to institute a complex regime of procedures to insure monthly medical review. We doubt the order complies with the statutory obligation that remedial orders adopt "the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3). Because the issue has not been the focus of evidence or argument, we refrain from making any definitive ruling.

If the Department is concerned with this aspect of the remedial order, the Department may move for review of that provision in the district court.