**Ray E. SHAIN, Plaintiff–Appellee–Cross–Appellant,**

v.

**John ELLISON, (Shield No. 761), individually and as a Nassau County police officer; John Doe, individually and as an Assistant District Attorney of Nassau County; The County of Nassau, a Municipal Corporation; Joseph Jablonsky, Defendants–Appellants–Cross–Appellees,**

---

7. In *Rivera–Figueroa,* we upheld the power of Congress to enact 18 U.S.C. § 2119 under the Commerce Clause. 149 F.3d at 3–4.

James H. Madden, individually and as a Judge of Nassau County, Defendant–Cross–Appellee.

Docket Nos. 00–7061(L), 00–7069(XAP).

United States Court of Appeals, Second Circuit.

Argued Oct. 19, 2000.

Decided Oct. 19, 2001.

58

Robert L. Herbst, Herbst & Greenwald, LLP (Gayle Pollack, on the brief), New York, NY; Ray E. Shain, pro se, Williston Park, NY, for Plaintiff–Appellee–Cross–Appellant.

Paul F. Millus, Snitow & Cunningham, LLP (Robert P. Devlin, on the brief), New York, NY, for Defendants–Apellants–Cross–Appellees County of Nassau and Joseph Jablonsky.

Carol Fischer, Assistant Solicitor General (Eliot Spitzer, Attorney General of the State of New York, Robert E. Forte, Deputy Solicitor General, and Michael S. Belohlavek, Assistant Solicitor General, on the brief), New York, NY, for Cross–Appellee Judge James H. Madden.

Herbst & Greenwald, LLP (Robert L. Herbst and Gayle Pollack of counsel), New York, NY, for Amici Curiae Putative Class Members in Augustin v. Jablonsky.

Emery Cuti Brinckerhoff & Abady PC (Richard D. Emery, Matthew D. Brinckerhoff, John R. Cuti, and Nina Morrison, of counsel), New York, N.Y. for Amici Curiae 65,000 Class Members in Tyson v. City of New York and Plaintiffs in O'Day v. Nassau County.

Daniel L. Greenberg, Sarah Kerr, John Boston, Laura Johnson, New York, NY, for Amicus Curiae Legal Aid Society.

Michael D. Hess, Corporation Counsel of the City of New York (Larry A. Sonnenshein and Kathleen Alberton of counsel), New York, NY, for Amicus Curiae New York City Department of Correction.

Before: CABRANES, POOLER, KATZMANN, Circuit Judges.

POOLER, Circuit Judge:

This appeal requires us to determine whether it was clearly established in July 1995 that corrections officers in a local correctional facility could not perform a strip search including a non-intrusive examination of body cavities on an individual arraigned on misdemeanor charges unless the officers had reasonable suspicion that the individual possessed contraband or weapons. We hold that after this court's decisions in *Wachtler v. County of Herkimer*, 35 F.3d 77 (2d Cir.1994), *Walsh v. Franco*, 849 F.2d 66 (2d Cir.1988), and *Weber v. Dell*, 804 F.2d 796 (2d Cir.1986), no law enforcement officer reasonably could have believed that it was permissible to perform such a search absent individualized reasonable suspicion.

## BACKGROUND

### I. Shain's Arrest and Strip Search

On July 29, 1995, Nassau County police

officers including Peter Ellison[1] responded to a 911 call from Dr. Donna Denier, who was then married to plaintiff Ray Shain, at the couple's residence. Denier showed Ellison a recently expired order of protection that required Shain to stay out of her bedroom. When Ellison realized that he could not arrest Shain for violation of the order of protection, he interviewed Denier because

> [He] wanted to get a clearer picture of exactly what [Shain] did, to see if [he] could arrest him, if there was another charge that [he] could arrest him on besides the order of protection [and after the interview, he] determined that [he] could arrest him minus the order of protection, without it.

Ellison testified that Denier told him Shain entered her room and threatened to rape her and that Ellison then believed he had probable cause to arrest Shain. In his police report, Ellison said:

> COMP REPORTS AT TIME AND PLACE OF OCCURRENCE LAYING IN HER BED READING WHEN HER HUSBAND ENTERED ROOM. SHE TOLD HIM SEVERAL TIMES TO LEAVE AND HE STATED AGAIN, "I'M GOING TO FUCK YOU". SHE TOLD HIM TO LEAVE AGAIN AND FEARING FOR HER SAFETY SHE LEFT THE ROOM AND CALLED THE POLICE

Denier gave a more expansive account of her conversation with Ellison, claiming that she also told him that Shain previously had threatened her and been out of control and that he had thrown a table at her and swung a lamp at her on prior occasions.

Ellison testified that when he arrested Shain for first degree harassment, a Class B misdemeanor, Shain acted in an agitated manner. Shain himself admitted that he did not turn over a pocket knife when he was asked to empty his pockets. After retrieving the pocket knife, Ellison transported Shain to the police station and "rear-cuffed" him to a manacle in a holding cell. Despite Shain's complaints that he had undergone a spinal fusion as an adolescent and was in severe pain, Ellison refused to take the cuffs off or to front cuff Shain. Ultimately, Ellison and another officer took Shain to the Nassau County Medical Center where a doctor who examined him reported that Shain was experiencing muscle spasms and lumbar sprain and ordered that he not be cuffed behind his back. Ellison spent the balance of the night at the central police station.

The next day, Shain appeared before Judge James H. Madden, a District Court judge sitting as a Family Court judge, who arraigned Shain on Denier's family offense petition. Without holding a hearing, Judge Madden remanded Shain to Nassau County Correctional Center ("NCCC") without bond.

Upon Shain's arrival at NCCC, Officer James Dantunono directed him to remove all his clothes and submit to a visual body cavity search. Dantunono looked in Shain's ears, his mouth, his hair and under his arms, and then made him turn around, bend over and spread his buttocks apart with his hands to facilitate a visual inspection of his rectum. Dantunono also directed Shain to hold up his external genitalia for inspection. Shain was again strip searched the next morning before he left to appear in Family Court. When Shain appeared in court, Family Court Judge Norman Feiden released him and allowed him to return to his home. Denier withdrew the Family Court petition on August 7, 1995. However, on or about August 28,

---

1. Shain wrongly sued Officer Ellison as John Ellison.

1995, the Nassau County District Attorney's Office filed harassment charges against Shain pursuant to N.Y. Penal Law § 240.26. Subsequently, these charges were dismissed pursuant to an adjournment in contemplation of dismissal.

## II. NCCC's Strip Search Policy

Although NCCC claims that it does not subject individuals charged with misdemeanors and minor offenses to a strip search unless it has reasonable suspicion that the arrestees are concealing contraband or they have been remanded to NCCC's custody by a court, the written policies governing strip searches require corrections officers to strip search each newly admitted inmate. In addition, all of the corrections officials who testified conceded that all newly admitted inmates were strip searched regardless of whether they were judicially remanded. Thus, while arrestees held briefly in holding cells may not have been strip-searched, all arrestees admitted to the jail were.

## III. District Court Proceedings

Shain filed his lawsuit in the Eastern District of New York on July 29, 1996. In a second amended complaint dated July 7, 1997, Shain named Ellison; Judge Madden; "John Doe," an assistant district attorney; Joseph Jablonsky, the Sheriff of Nassau County; the County of Nassau and various anonymous corrections officers as defendants and requested damages for false arrest and imprisonment, malicious prosecution, abuse of process, the unconstitutional search of his person, assault and battery, and negligent and intentional infliction of emotional distress. He also sought a declaration that New York State Family Court Act § 155(2), which allowed his overnight incarceration without bail, and NCCC's strip search policy were unconstitutional and an injunction against their enforcement.

On April 16, 1997, by stipulation and order, the district court dismissed all claims against Judge Madden, leaving him as a defendant in name only to permit Shain to continue his challenge to Section 155(2). On January 9, 1998, the district court *sua sponte* dismissed Judge Madden as a defendant, finding that "[p]laintiff may not discontinue all claims against Judge Madden yet proceed to use him as a straw man to secure what is, in essence, an advisory opinion as to the constitutionality of § 155(2) of the Act."

On December 31, 1998, defendants moved for summary judgment on all of Shain's claims. Shain cross-moved for partial summary judgment establishing the unconstitutionality of NCCC's strip search policy. In an oral decision, Judge Wexler granted defendants' motion to dismiss Shain's false arrest, malicious prosecution, and abuse of process claims but reserved the excessive force and strip search claims for trial. In a published opinion dated June 1, 1999, Judge Wexler granted Shain partial summary judgment establishing that the strip search policy was unconstitutional and that Jablonsky was not entitled to qualified immunity. *See Shain v. Ellison*, 53 F.Supp.2d 564 (E.D.N.Y.1999). More specifically, the court stated:

> The policy of strip searching all misdemeanor and minor offense arrestees remanded to the NCCC, without requiring any suspicion that the remanded individual is concealing weapons or other contraband, violates the Fourth Amendment to the United States Constitution.

*Id.* at 568. The court noted that NCCC presented evidence of security problems that might be triggered by an order prohibiting it from strip searching all arrestees entering the facility but believed itself prohibited from considering this evidence

by *Weber v. Dell,* 804 F.2d 796 (2d Cir. 1986) and *Walsh v. Franco,* 849 F.2d 66 (2d Cir.1988). *See id.* at 567–68.

A jury heard Shain's excessive force claim and evidence related to damages on the strip search claim. It rejected the excessive force claim and awarded Shain no damages for the strip search. Shain then moved to set aside the verdict and, in the alternative, for a new trial. The court denied Shain's motion and entered a judgment granting Shain $1.00 in nominal damages, declaring the strip search policy to be unconstitutional, and dismissing the action on the merits.

Defendants County of Nassau and Jablonsky appealed, arguing principally that (1) the district court erred by failing to give proper deference to NCCC's security concerns; (2) *Weber* and *Walsh* do not govern this case because NCCC's policy was limited to arrestees who had been judicially remanded; (3) defendants had reasonable suspicion that Shain might be concealing a weapon and thus Shain lacked standing to challenge NCCC's general policy; and (4) Jablonsky was entitled to qualified immunity because the law concerning strip searches of misdemeanor pre-trial detainees was unsettled. Shain, who is an attorney, has submitted two briefs on his cross-appeal. In his counseled brief, Shain defends the district court's strip search holding while arguing that the district court should have granted injunctive relief and a new trial on damages. In his *pro se* brief, Shain contends that the district court erred by failing to grant him summary judgment on his false arrest claim; dismissing the malicious prosecution, abuse of process, and false arrest claims; dismissing his claims against Judge Madden and failing to reach the issue of the constitutionality of Section 155(2); and declining to grant a new trial on the excessive force claim.

Several *Amici Curiae* have submitted briefs on the strip search issue. The New York City Department of Correction, which has a strip search policy similar to NCCC's, seeks reversal of the district court's decision. Class counsel for the plaintiffs in *Tyson v. City of New York,* No. 97 Civ. 3762 (S.D.N.Y.) (JSM), and *O'Day v. Nassau County,* 99–CV–2844 (E.D.N.Y.) (DRH)(ARL) primarily request that the court not retreat from *Weber* and *Walsh* insofar as these decisions apply to pre-arraignment detainees who are the plaintiffs in these two lawsuits. Plaintiff's own counsel, who is also the attorney for the putative class members in *Augustin v. Jablonsky,* CV–00–3126 (E.D.N.Y.) (DRH)(ARL) has submitted a brief on their behalf in opposition to the strip search policy. Finally, the Legal Aid Society, which represents incarcerated individuals in New York, also has submitted a brief in opposition to NCCC's policy.

## DISCUSSION

### I. Strip Search Policy

#### A. *Legality and Qualified Immunity*

█ Although it appears likely that NCCC's strip search policy applied to all persons actually admitted to the jail whether they had been arraigned or not, we consider the legality of that policy as it applies to post-arraignment admittees to the jail because Shain himself was a post-arraignment admittee.

Before Officer Dantunono searched Shain in July 1995, we had decided three cases relevant to the issue before us. In *Weber,* we considered a Monroe County Jail policy "calling for strip/body cavity searches of all arrested persons other than those placed in 'holding cells,' which are the cells in which arrestees are sometimes placed when their release on bail is imminent." *Weber,* 804 F.2d at 799. The

police arrested plaintiff Ann Weber on misdemeanor charges of making a false complaint and resisting arrest. *See id.* After jail officials booked Weber, they required her to remove her clothing and "expose her body cavities for visual inspection." *Id.* We held "that the Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." *Id.* at 802. Although the defendants argued that their policy applied only to arrestees who could not make bail and thus were to be admitted to the general prison population, we found it unnecessary to remand for factual findings because "even the more narrowly drawn policy would be unconstitutional." *Id.* We also rejected defendants' request for qualified immunity because all the circuits that had addressed similar policies had found them to be unconstitutional and because we long had stressed the intrusive nature of body cavity searches. *See id.* at 803.

*Walsh* reaffirmed the *Weber* holding, *see Walsh,* 849 F.2d at 68–69, and *Wachtler* assumed *Weber's* applicability to the post-arraignment strip search of a person charged only with a misdemeanor. *Wachtler,* 35 F.3d at 81–82. We also found in *Wachtler* that the individual defendants were entitled to qualified immunity because the law did not clearly establish whether Wachtler's conduct was sufficient to trigger a reasonable suspicion. *Id.* at 81–82. However, we reinstated Wachtler's claims against the County of Herkimer pending a fuller development of the record. *See id* at 82. We said with respect to the County:

> If the standard procedure included routine strip-searches of misdemeanor arrestees, absent reasonable suspicion of weapons or contraband, and if no reasonable suspicion concerning Wachtler's possession of such items existed, then Wachtler would prevail.

*Id.* (citing *Weber,* 804 F.2d at 802–03).

Defendants contend that *Wachtler* does not indicate clearly that post-arraignment strip searches of persons charged with a misdemeanor are unconstitutional because the parties did not necessarily argue a distinction between pre- and post-arraignment searches. Be that as it may, we recognized that Wachtler had been arraigned and remanded to custody and nevertheless found that a policy that subjected him to a strip search without individualized reasonable suspicion would be unconstitutional. *See id.* at 79, 82. Because the unconstitutionality of a post-arraignment strip search absent reasonable cause was necessary to the court's holding in *Wachtler,* we reject defendants' argument.

Defendants next argue that we must not read *Wachtler* to prohibit strip searches of persons arrested for a misdemeanor after they have been arraigned because this reading would conflict with two Supreme Court decisions, *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and *Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). In *Bell,* the Supreme Court considered the constitutionality of a policy that subjected pretrial detainees to strip searches after a contact visit. It reasoned that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell,* 441 U.S. at 546, 99 S.Ct. 1861. Quoting *Pell v. Procunier,* 417 U.S.

817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the Court held that "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 548, 99 S.Ct. 1861. Applying these principles, the Court upheld a visual, no-contact body cavity search of detainees after contact visits with persons from outside the institution. It said, "assuming for present purposes that ... pretrial detainees ... retain some Fourth Amendment rights upon commitment to a corrections facility, we nonetheless conclude that these searches do not violate that Amendment. The Fourth Amendment prohibits only unreasonable searches, and under the circumstances, we do not believe that these searches were unreasonable." *Id.* at 558, 94 S.Ct. 2800 (internal citations omitted).

In *Block,* the Supreme Court upheld jail policies prohibiting contact visits by pretrial detainees and permitting jail authorities to conduct random searches of cells in the absence of their pre-trial detainee occupants. However, its holding rests on a due process analysis and thus adds little to the holding of *Bell. See Block,* 468 U.S. at 590, 104 S.Ct. 3227; *see also Weber,* 804 F.2d at 800.

In *Weber,* we said that *Bell* did not "read out of the Constitution the provision of general application that a search be

justified as reasonable under the circumstances." *Weber,* 804 F.2d at 800. We also described three factors potentially supporting the determination that the *Bell* plaintiffs had no right to be free of a strip search: they already had been arraigned; they had failed to make bail; and they "had presumably chosen to receive visitors and to enjoy physical contact with them." *Id.* In *Wachtler,* we implicitly held that the mere fact of arraignment did not remove a misdemeanor arrestee from the purview of *Weber* and place him within the ambit of *Bell. See Wachtler,* 35 F.3d at 79, 82. The *Wachtler* result is not at odds with *Bell.* First, the *Bell* court did not address the issue of whether persons charged only with misdemeanors must be treated differently from persons charged with felonies.[2] Second, and more important, *Bell* authorized strip searches after contact visits, where contraband often is passed. *See Block,* 468 U.S. at 586, 104 S.Ct. 3227. It is far less obvious that misdemeanor arrestees frequently or even occasionally hide contraband in their bodily orifices. Unlike persons already in jail who receive contact visits, arrestees do not ordinarily have notice that they are about to be arrested and thus an opportunity to hide something. For the exceptions—for example, a person who is allowed to visit the bathroom unescorted before an arrest—reasonable suspicion may well exist.

---

**2.** In fact, the Court saw no basis for distinguishing between pretrial detainees and convicted inmates because

There is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates. Indeed, it may be that in certain circumstances they present a greater risk to jail security and order. In the federal system, a detainee is committed to the detention facility only because no other less drastic means can reasonably assure his presence at trial. As a result, those who are detained prior to trial may in many

cases be individuals who are charged with serious crimes or who have prior records. They also may pose a greater risk of escape than convicted inmates. This may be particularly true at facilities like the MCC, where the resident convicted inmates have been sentenced to only short terms of incarceration and many of the detainees face the possibility of lengthy imprisonment if convicted.

*Bell,* 441 U.S. at 546 n. 28, 99 S.Ct. 1861 (internal citations omitted).

Finally, defendants argue that arraignment represents a crucial step in criminal proceedings that justifies heightened security measures. In *Block*, the Supreme Court said that "[t]he very fact of nonrelease pending trial ... is a significant factor bearing on the security measures that are imperative to proper administration of a detention facility" because of the ease of obtaining bail or release on one's own recognizance. *Block*, 468 U.S. at 583, 104 S.Ct. 3227. The same cannot be said of a misdemeanor arrestee in New York because he *must* be released on his own recognizance or granted bail. *See* N.Y.Crim. Proc. L. § 170.10(7). It is only because Denier proceeded civilly against Shain in Family Court that the judge could hold him without bail and without considering the statutory factors relevant to criminal detainees despite the fact that he was charged only with a misdemeanor. *Compare* N.Y. Fam. Ct. Act § 155(2) *with* N.Y.Crim. Proc. L. § 510.30(2)(a). Although a New York felony defendant's post-arraignment detention may well be an indicator of an increased security risk, a person charged with a misdemeanor who remains in jail in New York after arraignment probably does so because (a) he cannot afford the bail set; (b) he refuses to post bail; or (c) he was arraigned on a Family Court matter, *see* N.Y. Fam. Ct. Act. § 155, Douglas J. Besharov, Practice Commentary (discussing abuse of Section 155). None of these scenarios creates a reasonable suspicion that the alleged offender has secreted contraband or a weapon.

The dissent, albeit not the defendants or the *amicus* who supports defendants' position, argues that a separate line of Supreme Court cases employing a different analytical model controls the outcome of this appeal. These cases hold that a reasonable relation to a legitimate penological interest suffices to establish the constitutionality of a *prison* regulation. *Washington v. Harper*, 494 U.S. 210, 223, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Turner v. Safley*, 482 U.S. 78, 87, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Between *Walsh* and *Wachtler*, we employed the *Turner* model to uphold the legality of a strip search that took place in a prison. *Covino v. Patrissi*, 967 F.2d 73 (2d Cir.1992). Covino, who had been charged with kidnapping a child under the age of sixteen, *id.* at 74 n. 1, was housed in a state correctional facility where he was commingled with sentenced inmates. *Id.* at 75. We upheld the pertinent regulation, which allowed random strip searches of inmates, despite Covino's pretrial detainee status because the regulation was "reasonably related to legitimate penological interests." *Id.* at 78 and n. 4. *Turner, Washington, O'Lone and Covino* each approved a regulation of a state correctional facility or prison, but NCCC is a local correctional facility or jail. A prison is "[a] state or federal facility of confinement for convicted criminals, esp[ecially] felons." BLACK'S LAW DICTIONARY 1213 (7th ed.1999). A jail, on the other hand, is "[a] place where persons awaiting trial or those convicted of misdemeanors are confined." *Id.* at 838. This distinction is reflected in New York where state correctional facilities, commonly referred to as prisons, house those convicted of the most serious crimes and local correctional facilities or jails house persons convicted of minor crimes and pre-trial detainees. *See* N.Y.Crim. Proc. L. § 430.20(2),(3); N.Y. Penal L. §§ 70.00(1), 70.15.

Despite the limitation of *Turner, Washington, O'Lone,* and *Covino* to prison regulations and the substantial difference between jail and prison populations, the dissent contends that *Turner* implicitly overruled *Weber*. We disagree. We

start with the proposition that we have "no authority to depart from Second Circuit precedent, unless it has been overruled in banc or by the Supreme Court." *Leecan v. Lopes,* 893 F.2d 1434, 1443 (2d Cir.1990). Additionally, we should not lightly assume that two prior cases of this court are inconsistent, and we must accept a plausible reading of a case that renders it consistent with other Second Circuit precedent even where an alternative reading exists. *See, e.g., Rocket Jewelry Box v. Noble Gift Packaging,* 157 F.3d 174, 176 (2d Cir.1998). Neither *Turner* nor *Covino* purports to address any issue other than *prison* regulations. Thus, these cases can be read consistently with *Weber* and its progeny by confining them to their facts and actual holdings.[3] The dissent's arguments for "assum[ing] that when the *Turner* Court developed the 'reasonably related' standard, it intended for it to apply to facilities like NCCC" may be relevant to whether the *Turner* line of cases should be extended to jails by the Supreme Court, but they are not relevant to the question of whether *Turner* overruled *Weber.* [Dissent, *infra,* at 74]

The district court therefore correctly held that because it was clearly established in 1995 that persons charged with a misdemeanor and remanded to a local correctional facility like NCCC have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons, Jablonsky was not entitled to qualified immunity. The illegality of the sheriff's policy also provides the

necessary basis for affirming the County's liability. *See Weber,* 804 F.2d at 803 (holding Monroe County liable for strip search policy implemented by its sheriff).

## B. Standing

Even assuming the illegality of NCCC's policy, defendants argue that Shain cannot complain because NCCC had reasonable suspicion concerning him based on the court remand and on facts known by law enforcement personnel other than Dantunono, the officer who actually performed the strip search. We disagree. Although searching officers may rely on information provided to them by their colleagues, *see Velardi v. Walsh,* 40 F.3d 569, 574 (2d Cir.1994), there is no evidence that Ellison, who was employed by the Nassau County Police Department, or the officers who accompanied Shain to and from court, communicated any information to Dantunono. Thus, the only information Dantunono knew and the only fact NCCC required for a strip search was the fact of the remand.[4] This remand merely required NCCC to receive and detain Shain until his Family Court appearance and indicated that Shain had been charged under Article 8 of the Family Court Act. Because Article 8 covers offenses ranging from disorderly conduct to assault, the remand itself could not provide reasonable and individualized suspicion. In fact, Lieutenant John Considine, commanding officer of NCCC's operations unit, conceded that the information in Shain's file would not have

---

3. A panel of this court recently stated in *dicta* that "[p]enological interests are ... arguably not an appropriate guide for the pretrial detention of accused persons" because penological interests relate to convicted persons. *Benjamin v. Fraser,* 264 F.3d 175, 187 n. 10 (2d Cir.2001). Because we applied *Turner* to the rights of a pretrial detainee who had been charged with a serious crime and who was

commingled with sentenced inmates in a state prison in *Covino,* we do not rely solely on Shain's status as a pretrial detainee.

4. As noted previously, we accept for the sake of argument that NCCC did require a judicial remand, although the evidence appears to establish that it did not.

provided reasonable suspicion that he possessed contraband.

### C. The Injunction

Although plaintiff requested an injunction against future enforcement of the blanket strip search policy, the district court judgment neither explicitly granted nor denied this request. Plaintiff's attorney objected to the proposed judgment, in part, on the basis that it did not address the injunction. Plaintiff now claims that the district court erred by failing to grant an injunction once the illegality of the strip search procedure was established. Defendants respond that the district court did not err because NCCC voluntarily suspended its policy pending appeal. However, the record before us is not adequate to determine whether injunctive relief is necessary, and the district court did not make findings of fact or conclusions of law relevant to the grant or denial of injunctive relief. Therefore, we remand to allow the district court to make the necessary findings and conclusions. *See* Fed.R.Civ.P. 52(a).

### D. Refusal of New Trial on Damages

■ In his charge, the district judge instructed the jury that if it found defendants had violated Shain's constitutional rights but he had not suffered a compensable injury, it should award nominal damages not to exceed one dollar. The judge also instructed the jury that he previously had found defendants' strip search policy to be unconstitutional. When the jury returned its verdict, the court asked what compensatory and punitive damages the jury had awarded on the strip search claim and the foreman responded "Zero." The judge did not ask what nominal damages the jury had awarded. Plaintiff then moved to set aside the verdict and for a new trial, and the court denied both mo-

tions. However, the court did enter a nominal damages judgment of one dollar. On appeal, Shain argues only that the court should have granted him a new trial on damages.

■ We review a district court's decision not to grant a new trial on damages solely for abuse of discretion. *See Amato v. City of Saratoga Springs,* 170 F.3d 311, 314 (2d Cir.1999). The district court should not grant such a motion "unless [it] is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Id.* (internal quotation marks omitted). Shain cannot meet this high standard. He produced no objective medical or psychological testimony linking a psychological or physical injury to the strip search, and although he and his former girl friend testified that he was emotionally traumatized by the search, the jury was not required to credit this testimony. *See id.* at 314–15. Nor was it error for the court to correct the jury's verdict by entering a nominal damages award of one dollar since nominal damages are appropriate for the violation of a constitutional right. *See Dawes v. Walker,* 239 F.3d 489, 497 (2d Cir.2001) (collecting cases holding that it is error not to award nominal damages where a constitutional violation is established).

## II. False Arrest

■ In order to make out a New York common law or Section 1983 claim for false arrest or imprisonment, plaintiff must demonstrate that defendant intended to confine him, he was conscious of the confinement, he did not consent to the confinement, and the confinement was not otherwise privileged. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995). An arrest made on probable cause is privileged, and probable cause exists "when the arresting officer has

knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Id.* at 119 (internal quotation marks omitted). The officer may rely on the victim's allegations. *See Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000).

New York Penal Law § 240.25, which defines first degree harassment, states in relevant part:

> A person is guilty of harassment in the first degree when he or she intentionally and repeatedly harasses another person by following such person in or about a public place or places or by engaging in a course of conduct or by repeatedly committing acts which places such person in reasonable fear of physical injury.

Ellison's report of the incident stated that Denier told him Shain entered her bedroom, refused several requests to leave, and threatened to rape her.[5] We find that Shain's alleged refusal to leave the room after repeated requests coupled with his alleged threat to rape Denier constituted a course of conduct that could reasonably have caused Denier to fear for her safety. *See People v. Murray*, 167 Misc.2d 857, 861, 635 N.Y.S.2d 928 (N.Y.Crim.Ct.1995) (finding course of conduct within the meaning of the harassment statute where "[d]efendant walked along side the complainant to her office, barr[ed] her way when she sought to escape inside [and] continued to stalk her as she retreated up the street [and] forcibly prevent[ed] her from obtaining assistance from [a] parked van" although the conduct only lasted five to eight minutes). Therefore, we affirm the district court's dismissal of Shain's false arrest claim.

## III. Malicious Prosecution

In order to sustain a claim for malicious prosecution, Shain must demonstrate, among other things, that the prosecution terminated in his favor. *See, e.g., Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir.1997). Because an adjournment in contemplation of dismissal is not considered to be a favorable termination, Shain cannot sustain his malicious prosecution claim based on the criminal proceeding. *See id.* at 949. Nor can Shain rely on Denier's withdrawal of her Family Court petition because Denier is not a defendant in this lawsuit. We therefore affirm the district court.

## IV. Abuse of Process

"[A] malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). Bringing a defendant before a judge for arraignment satisfies the first element. *See id.* To show improper motive, Shain relies on Ellison's testimony that he knew Denier from the hospital and that after he found the order of protection had expired, he interviewed her further to determine whether there was another basis to arrest Shain. These allegations do not show intent to do harm without excuse or justification. Ellison's superficial acquaintance with Denier hardly suggests improper motive, and his continuance of the investigation when he found the order of protection had expired was merely good

---

5. We adopt Ellison's account rather than Denier's more expansive description because the false arrest claim was dismissed on a motion for summary judgment.

police work. The district court properly dismissed this claim.

## V. Excessive Force

▮▮▮▮ Shain contends that he also is entitled to a new trial on his excessive force claim principally because the court instructed the jury that Ellison could use sufficient force to arrest Shain. As we have found that Ellison did have probable cause to arrest Shain, the charge was not erroneous. *See Calamia v. City of New York*, 879 F.2d 1025, 1034–35 (2d Cir.1989). Shain also argues that the court abused its discretion by admitting Denier's testimony concerning his past abuse and her account of this abuse to Ellison. However, what Denier told Ellison was relevant to the jury's determination of whether Ellison used excessive force by rear cuffing Shain. Therefore, the district court did not abuse its discretion.

## VI. Judge Madden and Section 155(2) Claim

▮▮▮▮ The parties stipulated to dismiss all claims against Judge Madden but to keep him as a nominal defendant for the purpose of testing the constitutionality of Family Court Act § 155(2). The district court initially "so ordered" this stipulation but later dismissed the claims against Judge Madden in their entirety without directly ruling on plaintiff's claim that Section 155(2) is unconstitutional. The district court did not err because (1) at the time the court issued its *sua sponte* order (1) there was no realistic danger that Shain would face the same harm again and (2) there was no defendant against whom Shain could have recovered damages. Denier withdrew her Family Court petition on August 7, 1995, and there is no allegation that she ever filed another one. By the time Judge Wexler issued his order, the parties had been divorced for over a year. Because Shain could not show "that these *same parties* are reasonably likely to find themselves again in dispute over the issues raised in this appeal," he lacked a legally cognizable stake in seeking an injunction or a declaratory judgment. *Muhammad v. City of New York Dep't of Corrections*, 126 F.3d 119, 124 (2d Cir. 1997) (internal quotation marks omitted). Nor could Shain have obtained damages from any of the defendants because Judge Madden is protected by judicial immunity, *see Stump v. Sparkman*, 435 U.S. 349, 364, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), and the remaining defendants bore no responsibility for Shain's continued incarceration after the judicial remand.

## CONCLUSION

We affirm the district court's judgment except as to the failure to rule explicitly on Shain's request for injunctive relief against NCCC's strip search policy. With respect to that policy, we remand to the district court for further proceedings in accord with this opinion.

KATZMANN, concurring:

I join in Judge Pooler's opinion in this challenging case. Unlike Judge Cabranes in his thoughtful dissent, I believe it reaches the result required by the precedent of this Circuit with respect to the standard to be applied to cavity searches in cases such as this one. In short, *Turner v. Safley*, 482 U.S. 78, 89–90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and its progeny deal with prison regulations as they are applied to individuals charged with or convicted of felonies, while *Weber v. Dell*, 804 F.2d 796 (2d Cir.1986), *Walsh v. Franco*, 849 F.2d 66 (2d Cir.1988), and *Wachtler v. County of Herkimer*, 35 F.3d 77 (2d Cir.1994), concern the treatment of misdemeanor arrestees being held in jails. Because there has been no explicit indication from the

Supreme Court that it would apply its "reasonably related to penological interests" standard (rather than a "reasonable suspicion" standard) to cases involving misdemeanor arrestees being held in jail, I believe we are compelled to follow Circuit precedent, which distinguishes between these two types of cases. As *Wachtler* was decided well after *Turner*, it appears to me that this Circuit's approach to such cases is unchanged after *Turner*. I write separately to emphasize that while this Circuit's choice to distinguish for these purposes either between misdemeanors and felonies or between jails and prisons is not necessarily persuasive to me—and in fact I am not sure either is a distinction I would make if I were considering the question in the first instance—I do think that these distinctions are required by our earlier precedents. Because these precedents have not, in my view, been squarely overruled, I believe we have no choice but to apply the "reasonable suspicion" standard to the facts of this case.

JOSÉ A. CABRANES, Circuit Judge, dissenting in part:

I respectfully dissent from the majority's decision to evaluate the constitutionality of the cavity search at issue here under the "reasonable suspicion" standard we developed in *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir.1986), rather than under the "reasonably related to legitimate penological objectives" standard subsequently articulated by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 89–90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

In reaching this decision, the majority subjects Nassau County to liability for having an assertedly unconstitutional cavity-search policy, and subjects an individual defendant to liability for implementing it. Moreover, the majority remands the cause for a determination as to whether the District Court should enjoin the Nassau County Correctional Center ("NCCC") from continuing to conduct a cavity search of all people admitted to the facility.

The majority's decision is based on an artificial, untenable distinction between "prisons" and "jails," and creates a Circuit split where there was none—a Circuit split that calls out for resolution by the Supreme Court. In my view, the majority's decision finds no warrant in the Supreme Court's jurisprudence and, indeed, substantially and unnecessarily limits the reach of the leading Supreme Court cases in this area. In resolving the cavity-search issue as it does, the majority also requires, by what the majority holds are the dictates of the Constitution, that correctional facilities such as the NCCC be run in a manner that defies common sense.

Accordingly, I dissent from the holding that the applicable standard to evaluate the constitutionality of a cavity search in a jail is "reasonable suspicion" rather than "reasonably related to a legitimate penological interest." [1] I write briefly to explain why.

\*　　\*　　\*　　\*　　\*　　\*

As the majority notes, in *Weber v. Dell*, 804 F.2d 796 (2d Cir.1986), we developed a standard for assessing the constitutionality of cavity searches of arrestees: The Constitution, we held, "precludes prison officials from performing ... cavity searches of *arrestees charged with misdemeanors or other minor offenses* unless the officials

---

**1.** I agree with the majority as to its disposition of plaintiff-appellee-cross-appellant Ray E. Shain's false arrest, malicious prosecution, abuse of process, and excessive force claims, as well as with its disposition of his challenge to the constitutionality of the Family Court Act § 155(2). As to these issues, I concur in the reasoning and result of the majority opinion.

have a *reasonable suspicion* that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." *Id.* at 802 (emphasis added). In *Walsh v. Franco*, 849 F.2d 66, 68–69 (2d Cir.1988), and *Wachtler v. Herkimer County,* 35 F.3d 77, 81 (2d Cir.1994), we evaluated the constitutionality of cavity searches under *Weber's* "reasonable suspicion" standard.

Nearly one year after our decision in *Weber,* the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89–90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *see also Washington v. Harper,* 494 U.S. 210, 224, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (holding, *inter alia,* that *"Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights"); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (applying *Turner* and noting that "legitimate penological interests" include "deterrence of crime, rehabilitation of prisoners, and institutional security"). In *Covino v. Patrissi,* 967 F.2d 73 (2d Cir.1992), we evaluated a cavity search under *Turner's* "reasonably related" standard, and held that an arrestee may, in some circumstances, be subjected to a cavity search "in the absence of a[n] . . . individualized suspicion justifying the search," *id.* at 77–78—that is, even when there is no "reasonable suspicion" of the kind required by *Weber.*

The question here is this: Should we assess the constitutionality of the NCCC's cavity search policy ("policy") under *Weber's* "reasonable suspicion" standard (a standard *we* set forth) or under *Turner's* "reasonably related" standard (a standard *the Supreme Court* set forth)?

The answer to this question, thus posed, seems obvious enough—*Turner,* as a case decided by the Supreme Court, must prevail. But resolving the question is complicated by the fact that, regrettably, our cases decided after *Turner* pull in different directions: *Walsh* and *Wachtler* suggest that *Weber's* "reasonable suspicion" standard is controlling here, and *Covino* suggests that *Turner's* "reasonably related" standard is governing.

The majority sidesteps this difficulty by holding that the "reasonably related" standard is controlling where the relevant correctional facility is a "prison" (as was assertedly the case in *Covino* ), and that we must apply the "reasonable suspicion" standard that we enunciated in *Weber* and its progeny where the relevant correctional facility is a "jail" (as was assertedly the case in *Weber, Walsh, Wachtler,* and, as the majority states, here). *See* Majority Opinion, *ante,* at 66.

At first glance, ordering our cases in this manner is appealing: As a general matter, it is the duty of panels reasonably to harmonize our precedents, *see, e.g., Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.,* 157 F.3d 174, 176 (2d Cir.1998) ("[E]very panel of this court is bound by the decisions of earlier panels . . . ."), and the jail/prison distinction renders our caselaw internally coherent by shoe-horning all-but-contradictory lines of precedent into apparently distinct doctrinal categories.

However, the distinction between these categories is illusory, and I believe that organizing our caselaw along the jail/prison axis is error.

As an initial matter, the distinction drawn by the majority between jails and prisons is wholly unprecedented. The ma-

jority points to no cases that differentiate between jails and prisons in the manner that it suggests, and our sister Circuits routinely apply *Turner's* "reasonably related" standard to cases involving jails.[2]

They do so with good reason: There is no basis in the Supreme Court's jurisprudence for limiting *Turner's* "reasonably related" standard to cases involving correctional institutions denominated "prisons." It is true, of course, that the "reasonably related" standard nominally applies to "*prison* regulations." *See Turner*, 482 U.S. at 89, 107 S.Ct. 2254 (emphasis added). But the term "prison" is most frequently used generically to describe *any* government facility—including a "jail"—that function primarily as a place for the confinement of people involved in the criminal justice system. *See* BLACK'S LAW DICTIONARY 1194 (6th ed.1990) ("prison," first definition: "A public building or other place for the confinement of persons, whether as a punishment imposed by the law *or otherwise in the course of the administration of justice*") (emphasis added).[3]

There is no indication that the *Turner* Court intended to depart from this well-settled, non-technical meaning of the word "prison."

First, *Turner's* "reasonably related" standard, which, as noted, concerns "prison regulations," was itself based on four cases that concerned "prisoners' rights," *see Turner*, 482 U.S. at 86, 107 S.Ct. 2254:

2. *See, e.g., Mauro v. Arpaio*, 188 F.3d 1054, 1058–63 (9th Cir.1999); *Friend v. Kolodzieczak*, 923 F.2d 126, 127–28 (9th Cir.1991); *Siddiqi v. Leak*, 880 F.2d 904, 908–10 (7th Cir.1989); *see also, e.g., Rogers v. Arbisi*, No. 93 C 20237, 1996 WL 89346, at *5 (N.D.Ill. Feb.28, 1996); *Muhammad v. City of N.Y. Dept. of Corrections*, 904 F.Supp. 161, 197 (S.D.N.Y.1995); *Shaheed v. Winston*, 885 F.Supp. 861, 867–68 (E.D.Va.1995), *aff'd on other grounds* 161 F.3d 3 (4th Cir.1998) (table); *Pippins v. Adams County Jail*, 851 F.Supp. 1228, 1234 (C.D.Ill.1994).

3. To be sure, "prison" is *sometimes* used in a manner that suggests a contrast with a "jail." *See* BLACK'S LAW DICTIONARY 1194 (6th ed.1990) ("prison," third definition: "institutions . . . distinguished from . . . jails"). But that is relatively rare. It is more common to treat "jail" and "prison"—both of which are non-technical terms to everyone other than students of penology—as virtual synonyms. *See id.* (defining "prison" in a manner that encompasses "jail"); *id.* at 834 ("jail," first non-"obsolete" definition: "prison"). Consider, for example, *Weber*. In the majority's typology, *Weber* concerns jails, not prisons. But we held there that "*prison* officials" may not take certain actions. *Weber*, 804 F.2d at 802 (emphasis added); *see also id.* at 804 (describing the need "to defer to the judgment of *prison* officials") (emphasis added). Any possible distinction between prisons and local jails ap-

parently did not make an impression on the *Weber* panel, and, as the definitions quoted above suggest, the *Weber* panel's conflation of jail and prison is not merely a matter of linguistic imprecision. Rather, "jail" and "prison" are all-but interchangeable.

This said, to the extent that there is a sharp, commonly agreed-upon distinction between the terms, it is that prisons hold people convicted of crimes, and jails hold people merely charged with crimes. *See* BLACK'S LAW DICTIONARY at 834 (defining "jail"). But here, prisons and jails cannot be differentiated on this basis. The majority distinguishes *Covino*, in which we applied *Turner's* "reasonably related" standard, as a case that involved a prison, not a jail. *See* MAJORITY OPINION, *ante*, at 66. But the plaintiff in that case had not been *convicted* of a crime when he was searched— he had merely been *charged* with a crime. *See Covino*, 967 F.2d at 78 n. 4. Accordingly, if "prison" means a correctional facility that houses those *convicted* of crimes, as the majority suggests, *Covino* would have been a "jail" case, not a "prison" case, and we would have applied *Weber's* "reasonable suspicion" standard. But we did not do so; instead, we applied *Turner's* "reasonably related" standard. *See Covino*, 967 F.2d at 77–78; *accord United States v. El–Hage*, 213 F.3d 74, 81–82 (2d Cir.2000) (applying the *Turner* standard in a "jail" setting—that is, to assess a *pre-trial detainee's* constitutional claim).

(1) *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), (2) *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), (3) *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and (4) *Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). *See Turner,* 482 U.S. at 86–89, 107 S.Ct. 2254 (discussing these cases). Of these "prisoner's rights" cases, one case—*Procunier*—concerned what the majority would call a "prison"; but another—*Jones*—involved *both a prison and a jail, see Jones,* 433 U.S. at 122, 97 S.Ct. 2532, and two of them—*Block* and *Bell*—*exclusively concerned jails, see Block,* 468 U.S. at 578–79, 104 S.Ct. 3227, *Bell,* 441 U.S. at 524, 99 S.Ct. 1861. This suggests that there is no distinction of constitutional magnitude between jails and prisons. If there were such a distinction, the *Turner* Court would not have elided the difference between "jail" cases and "prison" case by characterizing certain "jail" cases (*Block, Bell,* and perhaps *Jones* ) as "prisoners' rights" case. *See Turner,* 482 U.S. at 86, 107 S.Ct. 2254. And similarly, the *Turner* Court would not have—indeed, *could* not have—derived from "jails" cases (*Block, Bell,* and perhaps *Jones* ) a standard that does not apply to them, but that applies only to what the majority would term a "prison" case.

Second, it is clear from *Turner's* rationale that the "reasonably related" standard was not intended to apply only to those institutions encompassed in the majority's narrow definition of "prison." The *Turner* Court adopted the relatively deferential "reasonably related" standard as a means of accommodating two distinct imperatives—first, protecting individual rights; and second, recognizing that "the problems of prisons in America are complex and intractable, and ... are not readily susceptible of resolution by [judicial] decree." *Id.* at 85, 107 S.Ct. 2254. As the *Turner* Court explained:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have ... additional reason to accord deference to the appropriate prison authorities.

*Id.* at 84–85, 107 S.Ct. 2254. In other words, a basic purpose of the "reasonably related" standard is to prevent the federal courts from becoming overly involved in the administration of corrections-related facilities that have chronic problems that the judiciary is, comparatively speaking, poorly-positioned to solve.[4]

---

**4.** *See Washington,* 494 U.S. at 223–24, 110 S.Ct. 1028 (stating that adoption of the "reasonably related" standard in *Turner* "was based upon the need to reconcile our longstanding adherence to the principle that inmates retain at least some constitutional rights despite incarceration with the recognition that prison authorities are best equipped to make difficult decisions regarding prison administration"); *cf. Turner,* 482 U.S. at 89, 107 S.Ct. 2254 ("Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby unnecessarily perpetuat[ing] the

But facilities that fit this description are as likely to be denominated "jails" as "prisons." The NCCC is an apt example. It operates 365 days a year and 24 hours a day. When Mr. Shain was subjected to a cavity search there, the NCCC employed 950 corrections officers and housed, on an average day, 1,800 inmates. Every year, more than 14,000 people are introduced into the NCCC population. Of those who are housed at the NCCC, some have been sentenced to terms of one year or less; some have been sentenced to longer terms of imprisonment and are awaiting transfer to state-run correctional facilities in upstate New York; and others have been charged with a range of crimes, including violent felonies.

In short, the NCCC is a large, complex facility. Running it undoubtedly "requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government," and it is therefore reasonable to assume that its problems, whatever they might be, are not "readily susceptible of resolution by [judicial] decree." *Turner*, 482 U.S. at 84–85, 107 S.Ct. 2254.

Accordingly, the rationale for the "reasonably related" standard applies as forcefully to the NCCC as it would to a facility formally called a prison, and we must therefore assume that when the *Turner* Court developed the "reasonably related" standard, it intended for it to apply to facilities like the NCCC. But by introducing an artificial distinction between prisons and jails, the majority substantially limits *Turner's* reach—and removes institutions like the NCCC from the ambit of the "reasonably related" standard.[5]

The majority justifies its formalistic cabining of *Turner*—and its concomitant holding that it is *Weber's* "reasonable suspicion" standard that applies in jails—by reference to the "substantial difference between jail and prison populations." MAJORITY OPINION, *ante*, at 65–66. However, factors such as the composition of a facility's population—or, indeed, the composition of the portion of a facility's population subjected to a particular regulation—are fully amenable to analysis under the *Turner* standard. *See, e.g., Covino*, 967 F.2d at 79 (stating that "the nature of [the facility's] inmate population" supported the finding that there was "a legitimate and rational connection between the challenged searches ... and [the facility's] security

---

involvement of the federal courts in affairs of prison administration.") (internal citations and quotation marks omitted).

5. As noted, by distinguishing our cases along a jail/prison axis, the majority hopes to reconcile our precedents with one another. *See ante* at 66. In this case, however, we need not attempt to do so. As a matter of logic, our application of *Weber's* "reasonable suspicion" standard in *Walsh* and *Wachtler* necessarily rested on a *sub silentio* holding that our decision in *Weber* survived the Supreme Court's subsequent decision in *Turner*. (I characterize this holding as *sub silentio* because neither *Walsh* nor *Wachtler* mention *Turner*, and there is no indication that the parties brought *Turner* to the attention of the *Walsh* or *Wacht-*

*ler* panels.) But *sub silentio* holdings do not bind subsequent panels. *See, e.g., Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 49 (2d Cir.2000); *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir. 1988). *See generally Webster v. Fall*, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."). Moreover, when a panel bases a decision *entirely* on Circuit precedent that has been implicitly overruled by the Supreme Court—as I believe *Weber* was by *Turner*—panels of our Court need not hew to the panel decision. *See, e.g., Zervos v. Verizon*, 252 F.3d 163, 167 (2d Cir.2001) (collecting cases).

interests"); *Michenfelder v. Sumner*, 860 F.2d 328, 332–33 (9th Cir.1988) (noting, while upholding visual body-cavity searches of inmates housed in a facility's maximum security unit each time a prisoner entered or left his cell, that "[t]he searches are conducted on convicted prisoners in [the facility's] most restrictive unit" and "[e]levated security precautions are justified for prisoners placed in maximum security settings . . ."). Indeed, because *Turner* requires that the interest identified by the government be "legitimate" and that there be a nexus between the restriction of a prisoner's constitutional rights and the interest, *see* 482 U.S. at 89–90, 107 S.Ct. 2254, facility regulations justified by penological goals applicable only to persons convicted of crimes—such as punishment—could not be imposed on pretrial detainees. In this case, however, the NCCC's asserted interest is facility security, which is a legitimate concern regardless of the status of the facility's population. *See Mauro v. Arpaio*, 188 F.3d 1054, 1059 & n. 1 (9th Cir.1999)(en banc).[6]

Another difficulty with the majority's holding is that it interprets the Constitution as requiring large, complex facilities such as the NCCC to be run less intelli-

gently—and less safely—than ought to be the case. In deciding whether and under what circumstances to permit cavity searches, responsible correctional officials would presumably balance the rights of prisoners (which are impinged on by cavity searches) and the safety of staff and other prisoners (which is enhanced—at least somewhat—by cavity searches). In determining how this balance should be struck in the context of any particular facility, common sense dictates that a number of factors are relevant, including whether the facility is overcrowded; whether it is equipped with drug-sniffing dogs and metal detectors; whether it has been infiltrated by gangs; and whether prisoners have attempted previously to secrete contraband in a manner detectable only by cavity searches. Because the "reasonably related" standard envisions a flexible, multifactor inquiry, *see Turner*, 482 U.S. at 89–91, 107 S.Ct. 2254, it would permit administrators to craft cavity search policies with an eye to each of these concerns.

By contrast, the "reasonable suspicion" standard requires prison administrators to focus on only one set of variables—those related to reasonable suspicion itself. Ac-

---

**6.** In expressing "doubt" in *dicta* over whether the use in *Turner* of the phrase "penological interests" limits its applicability to "persons convicted of crimes," the panel in *Benjamin v. Fraser*, 264 F.3d 175 (2d Cir.2001), cited Judge Kleinfeld's dissent from the en banc decision in *Mauro*. 264 F.3d at 187. Judge Kleinfeld, in turn, relied on a narrow definition of "penological" as "relating to the 'theory and practice of prison management and criminal rehabilitation'" and meaning, "roughly," "penalty or punishment." 188 F.3d at 1068. Judge Kleinfeld found support for his belief that the Supreme Court used "penological" in this narrow sense in its recognition in *Turner* that rehabilitation is a legitimate penological interest. *Id.* at 1068 & n. 8 (citing *Turner*, 482 U.S. at 97–99, 107 S.Ct. 2254). Judge Kleinfeld's analysis, however, fails to account for the reliance in *Tur-*

*ner* of facility security as the "penological interest" justifying a prohibition on inmate correspondence between institutions, *see Turner*, 482 U.S. at 91–92, 107 S.Ct. 2254, which reliance is inconsistent with his theory that "penological interests" are interests applicable only to prisoners convicted of crimes—after all, facilities housing prisoners may have legitimate security concerns regardless of whether those prisoners have yet been convicted of a crime. Indeed, the majority opinion in *Mauro*, in which the Ninth Circuit distinguished between penological interests that may be legitimately applied to pretrial detainees from those that may be legitimately applied only to those convicted of crimes, *see* 188 F.3d at 1059 & n. 1, demonstrates the appropriate use of the *Turner* multi-factor framework to a regulation affecting pretrial detainees. *See* 188 F.3d at 1058–63.

cordingly, the majority's application of the "reasonable suspicion" standard to jails means that administrators who manage facilities such as the NCCC will not be allowed to take into account any of the factors noted above. That makes no sense and, as I have argued, is not required by the Constitution.

\*    \*    \*    \*    \*    \*

The majority holds that we must assess the constitutionality of the cavity search at issue here under *Weber's* "reasonable suspicion" standard, not *Turner's* "reasonably related" standard. For the reasons stated above, I dissent.